IN RE ESTATE OF JOHN Z. EVANS.

WILLIAM J. EVANS et al., Appellants, v. P. H. HYNES, Appellee.

No. 40336.

SEPTEMBER 22, 1930.

REHEARING DENIED APRIL 10, 1931.

*Anderson & Perry* and *Chester W. Whitmore,* for appellants.

*Mabry & Mabry* and *Bates, Simmons & Richmond,* for appellee.

GRIMM, J.—We are here confronted with a record of 735 pages, together with numerous exhibits, including maps and blue prints. On July 16, 1912, John Z. Evans, a resident of Monroe County, Iowa, made his will. He died on the 18th day of April, 1913; the will was admitted to probate; and, on the 2d day of

May, 1913, the defendant, P. H. Hynes, who was nominated in the will as executor without bond and as trustee, qualified in both capacities. The material portions of the will are as follows:

"That all my property, namely: All my Stock in the Smoky Hollow Coal Company, of Avery, Iowa; All my Stock in the Avery Supply Company, of Avery, Iowa; All my Stock in the John Z. Evans Manufacturing and Supply Company, of Albia, Iowa; All of the above named are Incorporated Companies and they are to remain as they are and said Executor to take charge of all Properties, All Business and all Transactions that belong to me and to keep all said Business moving the same as if I were still on earth, with full powers and authority to continue the operation of said three Incorporated Companies so long as they or either of them can be in the judgment of my Executor, operated at a profit, unless sold by him as hereinafter provided. The said Executor to have the full power of all moneys and of all money due from all sources, to carry on all transactions of my business, with the power over all and said Executor to make a correct report to the Court, as the law requires, once a year, or more often if said Court demands same."

The legatees in the will were Leonard D. Evans, a grandson; William J. Evans, John G. Evans, and Harry F. Evans, sons; Emma Lemberger, Edna Fisher, and Lena V. Morrow, daughters.

Paragraph 8 of the will is as follows:

"There is to be no properties or property divided. All Properties must remain in the hands of the Executor and all heirs to draw their dividends, according to the judgment of my Executor, whatever it may be, at the end of each year. No heir shall contest this will or interfere with the Executor. The Court will decide whether or not he, the Executor, is doing his duty or justice."

Paragraph 9 is as follows:

"My Executor which I name, P. H. Hynes, of Avery, Monroe County, Iowa, is to have full power, and said Executor is to be free from any bonds and is to be paid the same wage that I pay him at the present time; Namely $9,000.00 (Nine Thousand Dollars) per year and 'Five' per cent to be added, to be taken from

the dividends that are made each and every year to all the heirs, with an additional fee of whatever the law allows any Executor, which I understand according to law is 'Two' per cent, and that Two per cent is in addition to the salary and an addition to the Five per cent named, which makes his per cent 'Seven' per cent of all business profits there are each and every year.''

Evans had been one of the pioneer coal operators of Monroe County. He organized two corporations for the transaction of his business: one, the Smoky Hollow Coal Company, was organized for the purpose of opening and developing coal mines and selling coal, and this, for brevity and convenience, hereinafter will be called the Coal Company; the other, the Avery Supply Company, was a corporation engaged in merchandising in connection with the operation of the Coal Company. The Coal Company was capitalized for $150,000, divided into 1,500 shares of $100 each, par value, of which Evans died owning 1,495 shares. The other five shares were owned by Hynes. The Supply Company had a capitalization of $20,000, and practically all the shares were owned by Evans. It appears that, by the books of the company, as of the date of the death of Evans, the Coal Company had what is called a ''surplus'' of $126,690.89 in cash and properties. The record does not show the assets of the Avery Supply Company.

At the time of the death of Evans, he owned another corporation, known as the John Z. Evans Manufacturing and Supply Company. Hynes took possession of these three corporations and proceeded to manage them. He became president of the corporations and the managing officer of each. Members of the Evans family were placed upon the boards of directors, and John G. Evans became vice president, and William J. Evans became secretary. This state of affairs continued from the time of Hynes's appointment and qualification, May 2, 1913, until May 22, 1928, when Hynes resigned as executor and trustee, and William J. Evans was appointed as such executor and trustee.

These consolidated suits involve controversies between the heirs of Evans, deceased, and the Smoky Hollow Coal Company, on the one hand, and Hynes, executor and trustee, on the other.

I. The trial court found for the defendant, both on the objections to the final report, in the probate proceedings, and in the equity action brought against Hynes for equitable relief.

There is in the arguments a claim to the effect that, as the issues joined in the objections to the final report of the executor are not triable *de novo* in this court, but must be affirmed if there is sufficient evidence to support the trial court's findings, therefore the equity action herein must be governed thereby. Under the views we take of this case, neither a discussion nor a determination of this question is necessary.

II. One of the main contentions between the parties involves royalties paid by the Coal Company to the defendant Hynes and some of his associates for coal removed by the Coal Company from lands to which the defendant,  or the defendant and some of his associates, held title to either the surface and coal rights or the coal rights only. We will also consider in this same connection error relied on for reversal No. 7, in which the plaintiffs claim that the defendant should be required to transfer to the Coal Company all his interest in the coal leases involved, but particularly his interest in what is known as the Northwest Coal Company lease and the Whitebreast Coal Company lease.

Up to July, 1919, the Coal Company had operated on both leased and purchased lands. In 1915, the mines at Avery were worked out, and it became necessary for the Coal Company to either go out of business or seek new fields. Hynes consulted members of his board of directors, and together they made an inspection of several pieces of property, and finally purchased 655 acres of coal land from the Wapello Coal Company, operating at Hiteman, Iowa. This mine is known in the language of this case as Smoky Hollow Coal Company Mine No. 10. It was operated until April 1, 1927.

In 1917, the Coal Company opened another mine, known as Mine No. 11, on what was known as the McDonald 160 acres. This mine was operated upon leased coal. Under date of September 20, 1919, P. H. Hynes, the defendant, as party of the first part, entered into a lease with the Smoky Hollow Coal Company, by P. H. Hynes, president, leasing to the said Coal Company for coal mining purposes what is known in the record as the "Cullen" 40, located in the immediate vicinity of Mine No. 11. The lease was on a royalty basis of 7 1/6 cents per ton of 2,000 pounds, mine run coal. Hynes had previously purchased

from the owner, by deed, the coal rights on this 40 acres. Here for the first time we find the defendant purchasing coal in the immediate vicinity of the Coal Company's operations and entering into a lease, executed on the one hand by Hynes personally, and on the other hand by the Coal Company, by Hynes as president.

Six or more similar transactions took place. In some instances, the title to the land or the ownership of the coal was in defendant Hynes, and in other. instances, in defendant Hynes and certain different employees of the company. It is the claim of the plaintiffs that the defendant Hynes and his associates collected royalties on these properties amounting to approximately $40,000, and that the defendant should be required to pay back, not only the portions of royalties collected by him, but likewise those collected by his associates. In this connection, it should be stated that these associates bore various relations to the company, as follows: Simon Phillips was treasurer of the Coal Company for a time, and kept the books; M. G. Youngquist was stenographer and sales manager; William Jones was superintendent; T. F. Cosgrove was pay-roll man, office manager, and store manager; W. J. Hynes was the nephew of the defendant Hynes, and lives in Des Moines. All of these parties except W. J. Hynes were employees of the Coal Company, and many of them had been so employed for many years.

It is the claim of the plaintiffs that these various parties who became associated with Hynes in the purchase of these coal rights were the very parties who, by virtue of their knowledge of the affairs of the Coal Company in its operations, were most likely to learn that these coal rights were being purchased by parties other than the Coal Company, and that these leases were being made to the Company, and the Company was paying royalties on these coal mine properties. In other words, it is the claim of the plaintiffs that these transactions were in the nature of bribes to the employees of the company, and given for the purpose of silencing them.

The defendant seeks to justify his conduct in buying these coal rights for himself and his associates upon the claim that it was the fixed policy of the testator, Evans, to always operate on leased property, and not to invest the company's money in either surface or coal rights where it was possible to secure leases, and

that Hynes, in purchasing these properties, was carrying out the established custom of the testator in operating the Coal Company. He testified upon the subject, without objections, as follows:

"Mr. Evans always said, 'Pat, take a lease, and let the other fellows take the chance.' We always worked on leased land."

There is evidence in the record that the testator purchased at least one piece of property, known as the Elder farm, and, as previously stated, the company, after the testator's death, purchased from the Wapello Coal Company certain properties on which Mine No. 10 was operated. Later, Hynes bought for the Coal Company what is known as the Horner tract, and also what is known as the Consistory land. It is claimed that the testator purchased only when he could not lease. It is also the contention of the defendant that most, if not all, of the property purchased by the defendant or by the defendant and others, and leased to the Coal Company, could not be leased, but that it became necessary to buy the coal rights. On the other hand, the plaintiffs contend that in such cases the purchase should have been made with company funds, for the company.

It is conceded that the royalty rates in each case are the ordinary and usual rates under such circumstances: that is to say, the Coal Company did not pay any higher rates of royalty to Hynes and to Hynes and his associates than it would have been compelled to pay, had it been able to lease the coal rights from other parties.

Certain of the plaintiffs, during all of this time, were on the board of directors of the Coal Company, and held offices in the corporation. One of the plaintiffs was treasurer of the company for many years, while these operations were going on, and signed the checks with which these royalties were paid. It appears that, at least a part of the time, these checks were signed in blank, and left with Hynes for the payment of the debts of the company. All these transactions appear on the books of the company. It appears that, in most, if not all, of the instances, the checks in payment of royalties, instead of being drawn to the several syndicates, were drawn to the individual members of each syndicate, in the amounts belonging to each of said members. The books were always open for inspection; but no attempt was made by the plaintiffs, or any of them, until late in 1927, to make any investigation on this subject.

8

During all this time, Hynes had filed annual reports in the probate proceedings, setting forth in detail the receipts and disbursements, the disbursements including money paid for royalties to the various parties who held the coal rights, including Hynes and his associates. In some instances, these coal rights were held by Hynes and his associates in the names of companies, such as the Whitebreast Coal Company, the Iowa Coal Lease Company, and the Northwest Coal Company. These names were assumed merely as a matter of convenience in preserving correct records of the transactions.

Early in his career as trustee, the defendant procured the services of an auditing company in St. Louis, which company, each year, audited the books of the Coal Company and filed a report with the company.

We will not undertake to even refer to all of the evidence in this large record. It has all been very carefully examined, and the foregoing statements thereof we consider sufficient.

The duties of trustees have been the subject of much litigation and much writing by distinguished textbook writers. Moreover, they have been the subject of many decisions, including many in our own state. The principles are well-known and generally recognized. If there is any difficulty at all, it is in the application of the principles to a given state of facts. It is unnecessary to extend this opinion by quotations from authorities. The subject-matter will be found well considered in the following cases: *Booth v. Bradford,* 114 Iowa 562; *Merrill v. Sax,* 141 Iowa 386; *Linsley v. Strang,* 149 Iowa 690; *Bennett v. Klipto Loose Leaf Co.,* 201 Iowa 236; *Becker v. Becker Bros.,* 202 Iowa 7; *Magruder v. Drury,* 235 U. S. 106; 1 Perry on Trusts and Trustees (7th Ed.), Section 129; Thompson on Corporations (2d Ed.), Section 1215; *Bird Coal & I. Co. v. Humes,* 157 Pa. St. 278 (27 Atl. 750); *Nebraska Power Co. v. Koening,* 93 Neb. 68 (139 N. W. 839). Numerous other cases might be cited.

We have no disposition to, nor do we hereby intend to, in any manner relax the strict rules applicable to the conduct of trustees. The question for determination is whether, under these rules, the defendant Hynes is liable to the plaintiffs, as charged.

First of all, it must be kept in mind that no claim is made to the effect that Hynes at any time used any of the company's

money in the purchase of coal rights held by him or his associates. In testing the conduct of Hynes, his relations with the testator must be taken into consideration, as must also the provisions of the will. It conclusively appears that Hynes grew up in the business of the testator, and during those long years of close contact, the testator learned to repose every confidence in the defendant. This is evidenced, not only by the salary which the testator paid to him, but more particularly by the broad, sweeping language of the will, evidently drawn by the testator himself, by which, in unmistakable terms, the testator expressed his full and complete confidence in the defendant.

Moreover, the testator, in express terms, directed the defendant to carry on as they had done together in the past. The record strongly supports the claim of the defendant that the testator preferred to operate on leases, rather than by owning property. Had the defendant, as he discovered the future needs of the company, permitted these coal holdings to pass into the hands of those who would, or at least might, demand exorbitant royalty rates, it might be said that he had not been diligent in the performance of his trust. By securing control of the coal rights, he thus very carefully guarded the future interests of the Coal Company. Manifestly, had he exacted more than the customary royalties, we would have had an entirely different question. Here, however, it conclusively appears that the royalties charged and paid were the usual and ordinary royalties current in that vicinity.

It appears that four of the complainants, plaintiffs, were directors of the Smoky Hollow Coal Company during most, if not all, of the period of the transactions involved, and one of these four directors was also secretary. All of these heirs had abundant opportunity to know, if they did not actually know, what was going on. As directors of the company, it was their duty to know. Apparently, so long as the operations of the company were proving very profitable, these heirs seem to have been entirely satisfied. During all of these years, the records of the company disclosed the actual facts. The most casual examination of them would have disclosed that these royalties were being paid, and to whom.

Without indulging in any further discussion, we deem it sufficient to say that we are not at all satisfied that the de-

fendant Hynes was guilty of any misconduct whatsoever, even under the strict rules applicable to trusteeships; and we find, as did the trial court, for the defendant on the issue of royalties and a transfer of the title to the coal rights.

III. It is further contended by the appellants that Hynes wasted the money of the Coal Company in driving entries into the Cullen 40, the Landsperger land, and the land covered by the  Whitebreast lease, when, as the appellants contend, the recovery of coal did not justify the expense; and it was claimed that they were driven for the primary purpose of getting out coal for which Hynes and his associates could collect royalties. The amount of these losses is estimated at over $14,000.

There is a great deal of evidence bearing on the question whether these various operations were justified. We will not extend this opinion by quoting from the evidence. Suffice it to say, we are not satisfied that a sufficient showing has been made to warrant us in charging these amounts to the defendant. There is abundant evidence in the record to justify the finding that the operations of which complaint is made, were in keeping with the general practice of mining in that locality, and that whatever was done, was done in the ordinary course of the business of the Coal Company. The records show that in these operations coal to the amount of approximately $60,000 in value.was removed and sold.

It is conceded that, generally speaking, coal mining in Iowa is a hazardous business. The record abundantly shows that only a few of the numerous operators make a profit and survive the difficulties. The profits to be made from operating a coal mine depend, not alone upon the manner in which the operation is handled, but much also depends upon general business conditions and the market for the finished product. Labor troubles often play an important part in developing the losses of such companies. It appears from the record that these losses occurred in the years 1920, 1921, and 1924. It appears from the record that the company had strikes in November, 1919, April, 1922, and April, 1927, the latter lasting about a year and a half. Many other items may have entered into these losses. The defendant was expressly given wide latitude in his operations. The record does not satisfy us that the defendant should be charged with any

part of these losses under consideration. On this issue, we are constrained to find for the defendant.

IV. It is next claimed by the appellants that the court erred in not charging to Hynes the sum of approximately $25,-000 for losses sustained by the estate in operating Mine No. 10 into the coal rights held by the company under the Whitebreast lease and the Northwest Coal Company lease. These developments were along what is known as R and RX entries, westerly into what is sometimes known as the Craig land.

Aside from that of William P. Jones, mine superintendent, the evidence of all witnesses who testified on the subject was to the effect that the operations were justifiable in good mining. As a matter of fact, after Jones had given his adverse opinion in the matter, he subsequently discovered that some of the best coal mined through No. 10 was obtained through this development, and it clearly appears that the company was still operating No. 10 mine, obtaining good coal in the Craig land, when the strike came on, in April, 1927. It is claimed that these operations prolonged the life of the company for several years, until it got No. 12 shaft open, for the purpose of continuing operations on land that could not be reached from No. 10.

It sometimes becomes necessary for a business concern, in order to hold its customers and its organization, to continue transacting business at a loss. Hynes, as trustee, was given by the testator the widest latitude in the exercise of his judgment and discretion. Upon the whole record, so far as this claim of the plaintiffs' is concerned, we agree with the lower court, and find for the defendant.

V. It is claimed that the court erred in not charging to Hynes the amount due from one Dan Shea, a long-time customer of the Coal Company's, in an amount approximating $3,000, with interest. There appears in the abstract a record of the business of Shea with the company from September, 1924, to May 13, 1926. It shows the purchase of carload lots as high as 25 per month, and represents approximately an aggregate purchase of coal during said period of more than $46,000. That such a course of conduct should have resulted in an unpaid note for $3,000 is neither evidence of bad faith nor incompetence, nor even poor judgment on the part of Hynes. Further comment is unnecessary. We find for the defendant on this issue.

VI. The plaintiffs complain because the court did not re-

quire Hynes to turn back $72,000 of salary received by him for his services during the period from 1920 to 1927, being the period during which the coal rights of which complaint was made, were purchased by Hynes or his associates.

It abundantly appears that the testator in this case was a shrewd and successful business man. He had started from the very bottom, in the troublesome and hazardous soft-coal-mining industry in Iowa, and had succeeded in an unusual way. The defendant Hynes started with the testator when Hynes was a mere boy, and he worked himself up to the point where this shrewd testator designated him in his will as both executor and trustee, and by unusual broad and comprehensive terms gave to this associate of years the widest discretion and powers. He not only gave Hynes the exclusive control of his property, but he definitely specified that Hynes was to be permitted to operate it without interference from anyone, including the beneficiaries. The successful manner in which the defendant has managed the trust is strong confirmation of the good judgment of the testator in creating the trust. It even appears that the defendant assumed a more tolerant and kindly attitude toward the children of the testator than had the testator himself. Notwithstanding the terms of the will, the defendant brought several of the heirs into the corporation organizations. He gave them lucrative positions with the companies, and, in addition, loaned to them, from his private funds substantial amounts, from time to time, which, in passing, we may say have not been paid. If we understand the record correctly, some of these parties are even defending against these claims with the statute of limitations.

Notwithstanding the fact that the defendant has given practically his entire life to John Z. Evans and the Evans estate; notwithstanding the fact that he so conducted himself as to gain the unqualified confidence and esteem of the shrewd, exacting, skillful, and successful testator, to the point where, after years of close contact with him, Evans made him his executor and trustee, under the unusual terms expressed in the will; notwithstanding the extent to which a very hazardous and generally unprofitable business has been made to produce very unusual and very substantial results, to the benefit of the beneficiaries, we are called, largely upon the basis of the fact that the defendant purchased some coal rights and permitted some of the employees

of the company to purchase some coal rights which were leased to the company upon the ordinary and usual rate of royalties, to take from this faithful and efficient servant and associate $72,000 of his reward, not only fixed by the testator in the will, but approved by the lower court. This we cannot do.

We have refused to require the defendant, Hynes, to refund the royalties he received by reason of the operation of certain lands belonging to the defendant personally, and in some instances owned by the defendant in conjunction with others. We do this partly because there is much in the record in support of the proposition that he bought these interests because he felt and believed he was doing what the testator would have had him do, if living. Moreover, the defendant has shown himself to be a man of skill and ability. It seems incongruous that if, in 1919, as the plaintiffs charge, he had embarked upon a career of fraud, if not of crime, as against the Coal Company, he would have been dumb enough to have blundered to the extent of having put upon the books of the company abundant evidence of the very transactions of which the plaintiffs complain. It will not do to say that, simply because these different pieces of land, in which, in the main, the ownerships were different, were treated under different syndicate names, the defendant was guilty of either deception or fraud. Every practical business man will quickly recognize the convenience, if not the importance, of so doing. It requires no expert to suggest several easy and simple ways in which the same results could have been obtained, and the entire transactions kept off the company's books. Moreover, brilliant men in charge of a line of business engaged in corrupt practices and improper self-aggrandizement are not prone to employ expert accountants year after year to check up on their perfidy.

This voluminous record, together with the authorities cited on the assignment under consideration, has been carefully examined, and we are content to abide by the directions of the testator in his will and the finding of the lower court, in the exercise of his sound discretion, on this question of compensation.

VII. Complaint is made that the lower court did not charge the defendant with interest on bank balances on account of deposits kept in the Albia State Bank and the Home Savings

14

Bank of Des Moines. It appears he was a stockholder in the Albia State Bank. There is a showing in the abstract of the amounts on hand on December 31st of each of the years from 1913 to 1927, both inclusive. The amounts in the Albia State Bank ranged from $39,000 to $131,000. In the Home Savings Bank, from the years 1921 to 1925, both inclusive, the deposits ranged from $16,000 to $25,000 On December 31, 1925, however, there appeared to be no deposits in this latter bank.

In the first place, inasmuch as there appears to have been, on December 31, 1913, a few months after the defendant took charge of the assets of the estate, on deposit in the Albia State Bank more than $59,000, it is fair to assume that the testator himself had been in the habit of keeping such amounts on deposit. There is no showing in the record that the testator ever received a cent of interest on checking account deposits. On the other hand, it will be recalled that, when the defendant took charge as executor and trustee, and came into possession of the assets of the three corporations, each was a going concern, and in active operation. One was a coal operating company, the other a merchandising company, and the third a manufacturing company. The largest amount of deposit is $131,389.90. This is less than $45,000 of a cash capital reserve for the operation of each of these three companies. On December 31, 1919, the total bank balances amounted to $77,228.37. The balance sheet of the Coal Company, at the close of business December 31, 1919, showed unpaid pay roll of $35,533.18. Thus it appears that, while the executor and trustee had in banks on December 31, 1919, $77,228.37, he had at that time an unpaid pay roll of more than $35,000 (presumably for two weeks), and accounts payable, accrued taxes, and insurance, including the above pay roll, of a total of more than $52,000, for the Coal Company alone.

Moreover, the Coal Company is shown to have annually sold coal for the years 1920 to 1926, both inclusive, in amounts ranging from $287,000 to $1,490,000. It appears from the record that the operating costs of the Coal Company's business for the two years 1918-1919 were $1,196,142.58. These figures are given solely for the purpose of conveying an idea of the extent of the business and the amount of money involved to carry it on.

The mercantile business was largely dependent upon the coal business. The defendant was engaged, in the main, in a very hazardous, seasonable, and fluctuating business. The record shows that it was frequently subjected to very expensive and disastrous strikes. Any prudent business man would, under the circumstances, keep at all times on hand a substantial cash balance subject to checking. Under these circumstances, the fact that these balances were kept in banks in one or more of which the defendant was interested as a stockholder is not material.

In this same connection, it is charged that the administrator held a dividend check of $20,000 from June 26, 1919, to March 26, 1920, and that he should be held accountable to the plaintiffs for interest thereon at 6 per cent during said time. It is unnecessary to dwell at length upon the facts concerning this latter transaction. The mere writing of the check did not in any way change the company's finances or the relation of the interested parties thereto. Why it was drawn in the middle of the year does not clearly appear, nor does it very clearly appear why it was not cashed and used when drawn. Suffice it to say, the defendant was not using the money for his own purposes. The fact that it remained on deposit for a few months while the check was not cashed may have been of some benefit to the bank of which the defendant was a stockholder; but as we view the situation, the manner in which this check was handled and the manner in which the defendant kept cash balances on hand for operating purposes all come clearly within the discretion given the defendant by the terms of the will. Moreover, the will provided that the beneficiaries should only be entitled to dividends at the end of the year.

We discover nothing unreasonable about the conduct of the defendant in these regards, and we hold for the defendant on the items represented by this error relied on for reversal.

VIII. It is claimed by the plaintiffs that the court should have charged the defendant the $1,200 which was the price paid an accountant of Des Moines for making an audit of the Coal Company's books shortly before the trial of this case.

It will be recalled that the defendant had, from year to year, procured an audit of the company's affairs by Ernst & Ernst, expert accountants, of St. Louis, with offices in many of the

 larger cities in the country. These reports were on file, and accessible to the plaintiffs. There is no claim that the books of the company and the repor,s of Ernst & Ernst were not available to the plaintiffs. Early in the disputes between the parties, which ultimately culminated in this litigation, demands were made upon the defendant for a new audit. He at no time refused to procure one, but promised to have a new and additional audit made by Ernst & Ernst as quickly as they could be engaged to do so. It was not forthcoming as speedily as the more or less impatient plaintiffs thought it should be, and they procured one of their own. The man who did the most of this work for the plaintiffs was used as a witness in their behalf. He, at the request of plaintiffs, made various compilations preparatory to trial, and furnished much of the statistical evidence in plaintiffs' behalf.

There is no complaint that the books were not properly kept, nor is it charged that any items of bookkeeping were falsified or concealed. From the standpoint of an accountant, the books appear to have been regular and unambiguous.

Prior to the time the defendant resigned, some of the plaintiffs were officers of the company, and had complete access to the company's books. When the defendant resigned, all of the books and records of the company passed into the inclusive control of some of the plaintiffs. If it became necessary for the plaintiffs to employ a bookkeeper or accountant, to develop for the plaintiffs, for their use in the litigation, statements, compilations, and other statistical data, the defendant, under the facts in this case, is in no wise liable therefor. The court did not err in refusing the allowance.

Many arguments are made on each side of this case which have not been referred to in the foregoing opinion. To do so would unduly extend it. The entire record has been given important consideration, but we deem it unnecessary to comment further. The cases considered in this appeal must be, and are,—

*Affirmed.*

EVANS, J., not participating.

All the other justices concur.